# FEDERAL BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

In re:

MICHAEL FROST/CARS & SUV OUTLET 2, LLC

DEBTOR.

| | |
|---|---|
| GARY KIMMELMAN<br>9331 A Neil Road<br>Philadelphia, PA 19115<br><br>   Plaintiff/Creditor<br><br><br>  v.<br><br><br>MICHAEL FROST /Alter Ego   #0339<br>8807 Ashton Road<br>Philadelphia, PA 19136<br><br>   and<br><br>CARS & SUV'S OUTLET 2 LLC  # 20-5933309<br>Cars and SUV's Outlet #2 Inc.   # 37 20157<br>CARS AND S.U.V OUTLET DBA # 20-239791<br>Auto Credit Menders & Management LLC<br>7104 Frankford Avenue<br>Philadelphia, PA 19135 | Chapter 11 Conversion<br><br>ADVERSARY PROCEEDING<br>NON DISCHARGE OF DEBT<br><br>TERM, 2010<br><br>CORE PROCEEDING<br><br>NO.  10-10480  bif<br><br>JUDGE:  FOX |

## JURISDICTION

The Court has jurisdiction to consider the following action pursuant to 28 U.S.C .§§ 157 and 1334.
Consideration of this action is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this motion and this case is proper pursuant to 28 U.S.C. §§ 1408 and 1409

## RELEVANT FACTS

Cars & SUV Outlet 2, LLC/Michael Frost (Debtor) filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (11 U.S.C. § 101) on January 23, 2010 to avoid Pa Common Pleas Court Jurisdiction in case # 4695, Hearing schedule February 2010

At the first meeting of Creditors on April 9, 2010; Debtor (Frost) failed to provide a true explanation of "Cars & Suv" financial conditions, and disavowed documents signed by the Debtor as fraudulent reproductions produced by the creditor (Kimmelman).

Debtor disavowed the submission of documents (statement of assets) to the court appointed attorney ( Alan Feldman) and notarized by attorney Gary Schafkopf, as computer generated forgeries.

1.    Planitiff, Gary Kimmelman ("Kimmelman") is an individual residing at 9331 A Neil Road, Philadelphia, PA.

2.    Defendent, Michael Frost ("Frost") is an individual residing at 8807 Ashton Road Philadelphia, PA  19136.

3.    Debtor, Cars & SUVS Outlet 2 LLC ("CSO2") is a Pennsylvania limited liability company with its principal place of business located at 7104 Frankford Avenue, Philadelphia, PA.

4.    Defendents, Cars and S.U.V's Outlet # 2 Inc.("CSO2") is a Pennsylvania active company with its principal place of business located at 7104 Frankford Avenue, Philadelphia, PA

5.    Defendents  CARS & SUV OUTLET ("CSO2") is a Pennsylvania active fictidious name corporation with its primary business location of 8807 Ashton Road, Philadelphia, PA

6.    Defendent Auto Credit Menders & Management LLC is a active limited liability

company with its principal place of business located at 9701 Bustleton Avenue

7.    Defendent Michael Frost is presently the sole member/owner/officer of defendants
listed in # 3 above   ( see attachments   X -4  )

8.    Defendents operated as a used auto retailer having locations at 7104 Frankford
Avenue, Philadelphia, PA ; 6900 Frankford Avenue (lot closed), 6800 Germantown Avenue (lot
closed), Philadelphia, PA.

9.    In October 2007, Frost and Kimmelman initially opened discussions regarding an
investment opportunity for Kimmelman in CSO2 LLC, unaware of the other CSO2 entities.

10.    Frost represented to Kimmelman that Defendent had two used car lots and that the
company would sell 50-60 cars per month, with an average profit of $3,000.00 per car.

11.    Frost, and his attorney Gary Schafkopf, Esquire, further represented that CSO2
had a debt ceiling of from $18,000.00 to $23,000.00.

12.    Frost also represented that he was in the midst of a legal dispute with his former
business partner, Robert Fanell, which dispute placed CSO2 Inc. & CSO in a serious cash flow
situation.

13.    Frost stated that he was looking for an "active" investor/partner to also work in
the business and to handle all CSO2's "back-office" responsibilities.

14.    In reliance upon Frost's representations, on or about November 10, 2007,
Kimmelman agreed to enter into a written Agreement with Frost (the "Nov 2007 Agreement");
which writing is attached to and incorporated into this averment. (Exhibit "A").

15.    The Nov 2007 Agreement was drafted by Kimmelman.

16.    Under the Nov 2007 Agreement, in consideration for Kimmelman loaning Frost
"a sum up to $25,000.00" for the sole purpose of purchasing Automobiles at the Capital Car

Auction, the parties agreed to the following terms:

      (a).    Kimmelman will receive $80.00/car for the use of his money prior to any dispersing of the profits from the sale of the automobiles.

      (b).    Kimmelman will hold all titles to automobiles purchased by Frost/CSO2.

      (c).    Kimmelman will receive 50% of gross profits less $250.00 pac [sic] for each car purchased.  No other expenses will be charged back to the cars.

      (d).    If after 90 days, the purchased cars were not sold, Frost will reimburse Kimmelman the full purchase price of the car, plus $650.00 per car [in addition to [paragraph 16 (a)] above.] All cars not sold will then become the property of CSO2.

      (e).    Frost's personal guaranty and car titles were the express collateral for the loan.

      (f).    Kimmelman was to receive his funds in cash at the time of the sale.

17.    Under the Nov 2007 Agreement, Kimmelman loaned Frost $22,140.00.

18.    In November 2007, the entire loan principal was used to purchase eight (8) vehicles from Capital Auto Auction, Inc.

19.    Two of the vehicles were sold and six are currently unaccounted for.

20.    It is believed and therefore averred that Frost took the proceeds from the sale of one vehicle, a 2000 Chevrolet Malibu LS and purchased two other vehicles that were resold to Alan Fein, an acquaintance of Frost, who then resold the vehicles for profit.

### ( Pursuant to Rule 7001(1) U.S.C. § 548   Fraudulent Transfer )

21.    In November and December 2007, after further negotiation, Kimmelman agreed

to invest additional funds into CSO2 in exchange for certain consideration including formal

employment terms and conditions.

22.    On or about January 10, 2008, Kimmelman and Frost entered into an

"Investment/Employment Agreement" (the "Jan 2008 Agreement"); which writing is attached to

and incorporated into this averment. (Exhibit "B").

23.    Notwithstanding the name given to the Jan 2008 Agreement, Kimmelman avers

that this was an express partnership agreement to operate CSO2's used car business between

Kimmelman and Frost as evidenced by the terms of the Jan 2008 Agreement itself.

24.    Under Section 1 of the Jan 2008 Agreement, Frost is identified as the

"Marketing/Sales Partner" and Kimmelman is identified as "Financial/Administrative Partner."

25.    Under the Jan 2008 Agreement, in consideration for Kimmelman investing

$225,000.00 in CSO2, Frost and Kimmelman agreed, inter alia, to the following terms:

      (a).    A Profit Distribution Plan whereby net profits were divided as:   40% for

Frost, 40% for Kimmelman; and 20% reinvested in vehicle inventories.

      (b).    The Profits from all consignment vehicles will be distributed according to

the Profit Distribution Plan.

      (c).    Frost's share of the profit distribution was to be 1/2 (one half) of the 40%

to be used to pay down any present debts of CSO2 from 2007.

      (d).    Monies owed pursuant to Frost's dispute with Robert Fanell (believed to

be from $16000.00 to $18,000.00) to Capital Auto Finance to be paid by Frost

within 10 days of execution of the Jan 2008 Agreement.

      (e).    Frost was to be reimbursed $16,900.00 by Kimmelman for which

Kimmelman would receive title to certain vehicles within 7 days of the execution

of the Jan 2008 Agreement.

(f).    Kimmelman was to have full responsibility for all the financial matters of the Company, including, all banking operations, all cash disbursements including payroll, paying of invoices, the reducing of expenses which included the renegotiation of present or future vendor contracts as deemed necessary to the financial interest/profits of the investor, and the hiring or terminating employees if necessary.

(g).    Kimmelman was to accompany Mr. Frost, to all auctions if time allows, that he intends to buy directly, and not use the floor plan, and be fully responsible for payment of those cars from the company checkbook.

(h).    Three accounts were established: (1) operational expenses required two signatures, (2) car inventory account required one signature (Kimmelman only), and (3) petty cash (one –signature either party).

(i).    Frost had access to review all checking accounts at all times, including access to all accounting software.

(j).    Kimmelman was to receive a salary of $875.00 per week plus a benefits reimbursement of a minimum of $1,307/month, for the cost of: health insurance, prescription and dental, a car and gasoline allowance, and cell phone.

(k)    Kimmelman 's interests were to be secured with a lien on 7104 Frankford Avenue.

(l).    If the Jan 2008 Agreement is terminated, Kimmelman was to receive 50% of all profits plus vehicle acquisition costs, after expenses from the sale of vehicles up to his initial investment until his initial investment is returned in full.

6

(m)    Kimmelman had the option to purchase a 50% interest in the Company for

$1.00 as long as Kimmelman keeps his initial investment of $225,000 for three

years from the date of execution of this option.

(n).    Kimmelman was also to be the notary of CSO2 at two locations in

Philadelphia.

(o).    Disbursements from any finance company reimbursements, warranty

company reimbursements, wholesaling of cars, insurance sales and all titling fees,

but not limited to the preceding cash flows, were to be disbursed evenly between

Kimmelman and Frost monthly.

(p).    Kimmelman was to receive an interest payment of 1.5% monthly/18%

annually on his investment of $225,000.00.

26.    The Jan 2008 Agreement was secured with a Judgment Note ("First Judgment

Note"); which writing is attached to and incorporated into this averment.  (Exhibit "C")

**(Pursuant to Rule 7001(2) Validity, Priority or Extent of Lien or other interest in property)**


27.    The Jan 2008 Agreement was drafted by both Kimmelman and Frost's attorney,

Gary Schafkopf, Esquire.

28.    The First Judgment Note was drafted by Frost's attorney, Gary Schafkopf,

Esquire.

29.    Upon final execution of the Jan 2008 Agreement, Kimmelman began to work full

time for CSO2.

30.    Kimmelman's investment of $225,000.00 was deposited into CSO2's bank

accounts, with $15,000.00 designated for the operational account and $210,000.00 into the car

inventory account for the purchase of vehicles.

31.     Frost then introduced Kimmelman to Michael Markow who became the buying

agent for CSO2 for purchase of vehicles at the National Automotive Independent Dealers

Auction in Bordentown, NJ and Hatfield, PA.

32.     For this service Markow was paid out of CSO2's car inventory account from

$100.00 to $200.00 per vehicle purchased.

33.     Between January and March, 2008 checks totaling in excess of $233,000.00 were

issued by Kimmelman from CSO2's car inventory account to Markow solely for this purpose.

34.     Markow would purchase the vehicles and title them in the name of AMCO and

then transfer the titles over to CSO2.

35.     On or about January 25, 2008, Kimmelman discovered that Frost, in November

2007, sold a vehicle on consignment belonging to Edward Guzak.

36.     Frost had kept all proceeds from the sale and without making the necessary

payment in the amount of $13,559.60 to Ford Motor Credit Corporation, the holder of the note

on the vehicle.

37.     On or about the second week of January, 2008, a City of Philadelphia L & I

inspector gave notice of impending closure of Frost's business, due to the failure to correct code

violations related to the inadequate safety features of the 7104 Frankford Avenue property.

38.     According to the notice, the initial inspection notice was from 9/2007, that went

unheeded by Frost, and that a Municipal Court code enforcement action was now pending.

39.     On or about the third week of January, 2008, bills payable by CSO2 from

transactions occurring prior to the Jan 2008 Agreement and in an approximate amount of

$55,000.00; an amount $32,000.00 in excess of the $23,000.00 debt ceiling represented by Frost

8

and Schafkopf began to arrive at CSO2.

40.     Later in January 2008, CSO2 receives shut off notices from PGW and PECO for non payment of 2007 bills.

41.     Fines and payments were made by Mr. Kimmelman directly or out of CSO2's operational account, to avoid any suspension of the business operations.

42.     Frost failed to honor rental the payment clause as specified by paragraph 27 of the Jan 2008 Agreement: "$675.00 to be paid to Mr. Kimmelman to offset mortgage payment to Victor Gordon. ( Mortgage Holder)."

43.     On or about January 25, 2008, Kimmelman paid off debt, out of CSO2's car inventory account, to Ford Motor Credit Corporation, pursuant to the consignment sale to Edward Guzak

44.     In January 2008, Kimmelman contacted Schafkopf regarding:

    (a).     Schafkopf's misstatements of material facts about the financial condition of CSO2;

    (b).     Frost's failure to follow paragraph 27 of the Jan 2008 Agreement; and

    (c).     Schafkopf's failure to provide the necessary collateral documentation for the security of Kimmelman's investment as specified in the Jan 2008 Agreement.

45.     On or about January 28, 2008, a meeting was held at 7104 Frankford Avenue between Kimmelman, Frost and Schafkopf, to determine how to move forward with the present unsatisfactory financial condition of CSO2, Frost's failure to perform under the Jan 2008 Agreement, and Frost's failure to execute the necessary security documents as provided under the Jan 2008 Agreement.

46.     At that meeting it was agreed that:

(a).    Kimmelman would have no obligation to pay Frost $16,900.00 as per

Section 1(D) of the Jan 2008 Agreement,

(b).    Kimmelman will be compensated when there was sufficient cash flow, so

that the financial condition of CSO2 would not be adversely affected.

(c).    A major financial problem was developing from the inadequate sales from

CSO2's 6900 Frankford Avenue location, and it was the opinion of both

Kimmelman, and Schafkopf that this lot needed to be subleased in order to

become financial sound, and protect Kimmelman's investment.

(d).    Frost would make arrangements with a real estate broker to find a suitable

tenant for the 6900 Frankford Avenue location, or attract an additional investor to

assume the expense of maintaining both locations without the necessary cash flow

from the 6900 Frankford Avenue Lot.

47.    Frost never took any action to resolve the problem at the 6900 Frankford Avenue

location.

48.    On or about February 3, 2008, Kimmelman and Frost met with Mr. Sanjay Peer;

from Peer & Co., who as paid $100.00 in cash to establish an accounting system for CSO2.

49.    In the second week of February 2008, Frost opened a CSO2 checking account

with Commerce Bank (Account #32 929365 9) (the "Commerce Bank Account"), without

informing or consulting Kimmelman.

50.    It is believed and therefore averred that Frost opened the Commerce Bank

Account for the purpose of redirecting CSO2 funds from vehicle sales into this secondary

account for Frost's own use. ( Exhibits  X, X-1, X-2)

51.    On or about February 15, 2008, Kimmelman met with Frost to discuss the consequence of not paying the Ford Motor Credit vehicle sold out of trust.

52.    Frost stated, "Close the company, and have the customer file a claim against the Pennsylvania Independent Dealer Association, which carries an insurance policy, to protect the public from fraudulent actions by used car dealers".

53.    In the third week of February, a check book for the Commerce Bank Account was delivered to CSO2.

54.    Kimmelman initially discarded the check book as he believed it was delivered in error from First Republic Bank, and did not notice that it was from Commerce Bank.

55.    In February 2008, Kimmelman questioned Frost about the customer financing that was not being received by CSO2 from Marlton Auto Credit for several car sales.

56.    Frost intentionally failed to inform Kimmelman that the funding checks from Marlton Auto Credit had already been diverted and deposited into the Commerce Bank Account.

57.    Frost informed Kimmelman that he had received no funds from Marlton Auto Credit.

58.    On or about February 21, 2008; Kimmelman made a payoff on behalf of CSO2, out of CSO2's car inventory account in the amount of $9217.63 to Univest Bank for a second vehicle sold by Frost on consignment prior to November 2007.

59.    On or about February 25, 2008, Kimmelman discovered that the check book was for the Commerce Bank Account and not CSO2's regular checking account maintained at First Republic Bank

60.    As financial officer for CSO2, Kimmelman knew he had a duty to investigate the Commerce Bank Account.

61.   Upon his investigation of the Commerce Bank Account, Kimmelman discovered that Frost had diverted approximately $20,000.00 received from Marlton Auto Credit and Credit Acceptance Corporation into the Commerce Bank Account. (attachment X-3 )

62.   Kimmelman immediately scheduled a meeting with Schafkopf to discuss the Commerce Bank Account.

63.   On or about February 25, 2008, Kimmelman received a phone call from Schafkopf who stated that Frost had taken the necessary action to protect his [Frost's] lease payment arrangement at 6900 Frankford Avenue, and had diverted all the funding monies (Marlton Auto Credit & Credit Acceptance Corporation) into the Commerce Bank Account, and henceforth, Kimmelman would no longer be in control of any of the financial aspects of CSO2, thus repudiating the Jan 2008 Agreement.

64.   Schafkopf told Kimmelman that the Jan 2008 Agreement was considered null and void, and no monies would be paid to Kimmelman, unless there was a substantial reduction in Kimmelman's financial payout.

65.   Schafkopf then proceeded to draft an Addendum to the Jan 2008 Agreement (the "Addendum") and Promissory Note which he tendered to Kimmelman for execution in late February, 2008.

66.   On or about February 28, 2008 Frost executed the Promissory Note which was referenced by and attached to the Addendum; the Promissory Note is attached to and incorporated into this averment. (Exhibit "D").

67.   Kimmelman reasonably feared that if he did not agree to the Addendum, he would be personally responsible for thousands of dollars in personal credit card expenses which were made by Kimmelman for the benefit of CSO2.

68.    Kimmelman, having no reasonable alternative, and seeking to protect his total investment in CSO2, agreed to execute the Addendum

69.    On or about February 29, 2008 Kimmelman and Frost executed the Addendum; which writing is attached to and incorporated into this averment. (Exhibit "E").

70.    Under terms of the Addendum, Frost and Kimmelman agreed, inter alia, that:

(a).    the Agreement of January 8, 2008 is made null and void with the exception of its ability to acknowledge the investment made by Gary Kimmelman to Michael Frost of CSO2

(b).    Gary Kimmelman's investment to Michael Frost of CSO2 is currently $255,000.00.

(c).    All money invested by Kimmelman was changed from an investment to a loan

(d).    the Promissory Note attached to the Addendum is an acknowledgment of the principal due and terms of repayment of the loan by Frost.

(e).    Kimmelman will be paid fifty percent (50%) of any monies collected from Louis Rodriguez by CSO2 regarding a vehicle purchased prior to the date of execution of this Addendum.

(f).    Kimmelman will be the Notary as long as he is available for all documents that require notarization by CSO2 at the rate of $4.00 per notarization for as long as he is owed money by Michael Frost.

(g).    Kimmelman will have permission and access to attend vehicle auctions with Michael Frost and may purchase up to two (2) vehicles per month at $100.00 over cost.

71.   Both the Addendum and the Promissory Note were drafted by Frost's attorney, Gary Schafkopf, Esquire.

72.   After full execution of the Addendum by Frost and Kimmelman, Kimmelman continued to perform his duties as finance officer as an employee of CSO2.

73.   During the first week of March 2008, Kimmelman met with Schafkopf regarding the changes in Kimmelman's investment compensation.

74.   Kimmelman negotiated directly with Schafkopf at Frost's insistence.

75.   In the first week of March 2008, Kimmelman and Schafkopf agreed that:

(a).   Kimmelman was to be compensated, $8420.00 per month for 27 months

(b).   The Promissory Note was to be executed by Frost.

(c).   Included in the $8,420.00 monthly payment, Frost would pay Kimmelman:

(i) $6400.00/monthly in interest on Kimmelman's investment of $255,000.00.

(ii). Kimmelman would receive a cash payment for his benefits package totaling $1307.00/monthly, and

(iii) $713.00/monthly in salary.

(d).   Approximately $10,625.00 was to be paid monthly over twenty-four (24) months against the principal amount of the loan.

76.   A separate employment agreement dated March 10, 2008 was drawn up by Schafkopf but not executed by Kimmelman because it did not correctly state the verbal agreement that was made; which writing is attached to and incorporated into this averment. (Exhibit "F").

77.     On or about March 10, 2008, Frost paid $2000.00 to Kimmelman per the
Promissory Note, upon Kimmelman's returning to the dealership.

78.     On March 10, 2008, at approximately 5:15 pm, Kimmelman received a phone call
from Schafkopf.

79.     Schafkopf said that Frost required an additional $20,000.00 from Kimmelman,
that Kimmelman must work additional hours, and must sign for additional bank funding with
Auto Use Funding Corporation on behalf of CSO2.

80.     A Mortgage agreement, that was substantially negotiated and agreed to by
Kimmelman and Frost through his attorney, and drawn up by Schafkopf for final execution, now,
according to Schafkopf would not be executed by Frost.  (Exhibit "H")

81.     Kimmelman then attempted to recover from Frost the vehicle titles from February
purchases.

82.     In response, Frost initiated a physical confrontation by blocking Kimmelman's
egress from leaving the premises.

83.     On or about March 12, 2008, Kimmelman closed the CSO2 car inventory account
and withdrew the balance of $1648.28.

84.     Schafkopf then contacted Kimmelman to try to mediate this deteriorating
situation, and suggested that Kimmelman should stay away from the dealership for a cooling off
period.

85.     On or about March 19, 2008, Kimmelman closed the CSO2 operating account and
withdrew the balance of $4332.97.

86.     On or about March 25, 2008, Kimmelman received a payment from Frost in the
amount of $6420.00.

15

87.   On or about April 10, 2008, Kimmelman received a payment from Frost in the amount of $2000.00.

88.   On or about April 14, 2008, Kimmelman received communication from Schafkopf, requesting documentation as to Kimmelman's total cash investment with Frost.

89.   In response, Kimmelman sent to Schafkopf banking information, a list of cars purchased from Capital Auto Auction, and what funds are still owed to Kimmelman, related to Frost's actions.

90.   On or about April 24, 2008, Frost filed a private criminal complaint in Philadelphia Municipal Court against Kimmelman (Exhibit "I")..

91.   Frost failed to make the April 25th payment of $6420.00.

92.   Sometime during the third week of April, Kimmelman was contacted by Schafkopf who informed Kimmelman that:

> (a).   no additional monies will be tendered to Kimmelman,
>
> (b).   he [Schafkopf] will not be handling any further negotiation, and
>
> (c).   Kimmelman will be notified by Frost's new attorney, Richard Heller Esquire.

93.   On or about April 24, 2008, Frost filed allegations of non-compliance with the Order of the Arbitrator against Kimmelman in Philadelphia Municipal Court.  (Exhibit "J").

94. On or about September 15, 2008 Kimmelman discovered that Frost was intentionally, knowingly, and without authorization, taking out advertising on behalf of CSO2 and paying for it with Kimmelman's credit card. (attachment Z-1,Z-2)

### ( Pursuant to Rule 7001(6)  U.S.C. § 523(a)(4))

---------------------------------------------------------------------------------------

## DECLARATION OF PARTNERSHIP

95.    Paragraphs 1-95 and 96-239 are hereby incorporated.

96.    On or about January 10, 2008, Kimmelman and Frost entered into an "Investment/Employment Agreement" (the "Jan 2008 Agreement"); which writing is attached to and incorporated into this averment.  (Exhibit "B").

97.    Notwithstanding the title given to the Jan 2008 Agreement, Kimmelman avers that this was an express partnership agreement to operate CSO2's used car business between Kimmelman and Frost as evidenced by the terms of the Jan 2008 Agreement itself.

98.    Under Section 1 of the Jan 2008 Agreement, Frost is identified as the "Marketing/Sales Partner" and Kimmelman is identified as "Financial/Administrative Partner."

99.    Pursuant to the Jan 2008 Agreement, Kimmelman agreed to contribute $225,000.00 to the capital of the partnership.

100.    Section 1 of the Jan 2008 Agreement, provides that Kimmelman and Frost, as "partners", shall each receive 40% of the net profits from the sale of vehicles through CSO2; with the remaining 20% profits to be reinvested into CSO2.

WHEREFORE, plaintiff demands a decree:

1.    That plaintiff, Kimmelman be adjudged a co-partner with Defendant Frost under terms of the Jan 2008 Agreement and entitled to:

      a.    40% of the net profits from the sale of vehicles through CSO2;

      b.    One half of Frost's share of the profits of CSO2 until Kimmleman's principal of $225,000.00 is recovered.

      c.    One half of the profits which were to be reinvested into CSO2

      d.    Unpaid Interest at the rate of 1.5% per month from March 1, 2008 on the

principal

d.   Unpaid salary and benefits from March 1, 2008 to the present.

2.   That the profits of the partnership be divided and that plaintiff recover 50% of the profits of the partnership, attorneys' fees, and the costs of this action; and

3.   That plaintiff have such other and further relief as may be just and proper.


## BREACH OF CONTRACT

101.   Paragraphs 1-101 and 102-239 are hereby incorporated.

102.   The Nov 2007 Agreement specified the purchase of eight (8) vehicles for resale by CSO2 of which two of the vehicles were sold and six are currently unaccounted for.

103.   Kimmelman was paid $8,339.00 by Frost for the two vehicles sold by CSO2.

104.   The amount paid to purchase these vehicles for CSO2 was $6,670.00.

105.   The difference between the purchase price and the amount paid to Kimmelman was $1,669.00 which amount represented fifty (50%) percent of the net profits less $500.00, pursuant paragraph 3 of the Nov 2007 Agreement.

106.   Kimmelman never received his share of the net profits on the sale of the other six vehicles.

107.   It is believed and therefore averred that Frost sold all of the remaining six vehicles.

108.   It is believed and therefore averred that Frost took the proceeds from the sale of one vehicle, a 2000 Chevrolet Malibu LS and purchased two other vehicles that were resold to Alan Fein, an acquaintance of Frost, who then resold the vehicles for profit.

**Pursuant to Rule 7001(1) U.S.C.§ 548**

109.    If the vehicles were not sold, Kimmelman was to receive $650.00 per unsold vehicle, in addition to the return of the purchase price of each vehicle not sold.

110.    Kimmelman was also to receive $80.00 per vehicle or $640.00.

111.    Kimmelman has not received the return of the remaining amount of his loan principal of $15,470.00.

112.    It is believed and therefore averred that Frost sold the remaining eight vehicles and improperly converted the proceeds for his own use..

113.    Despite demands therefore, Frost has refused to pay any money due and owing to Kimmelman on the Nov 2007 Agreement.

114.    By his failure to pay Kimmelman all monies due and owing on the Nov 2007 Agreement, Frost and CSO2 is in material breach.

115.    Kimmelman requires that an accounting be made of all eight vehicles purchased under the Nov 2007 Agreement to determine the exact amount due and owing from Frost and CSO2.

116.    Kimmelman has suffered minimum damages of:

    a.    $3,900.00 for each of the six vehicles (if unsold); or 50% of all profits from the sale thereof less $250/vehicle

    b.    $640.00 @ $80.00/vehicle

    c.    $15,470.00 remaining balance of Kimmelman's loan to Frost.

    Total: $20,010.00, plus/minus adjustment for profits on sold vehicles.

WHEREFORE, Plaintiff Gary Kimmelman hereby demands judgment in his favor and against defendants, Michael Frost and Cars & SUVS Outlet 2 LLC, jointly and severally, in the

amount of $20,010.00, plus/minus adjustment for sold vehicles, plus interest, and court costs.

## BREACH OF CONTRACT/REPUDIATION

117.    Paragraphs 1-117 and 118-239 are hereby incorporated.

118.    Pursuant to the Jan 2008 Agreement, Frost agreed to give Kimmelman a security interest in both the real property at 7104-06 Frankford Avenue, and personal property belonging to CSO2.

119.    After the Jan 2008 Agreement was executed, Frost refused to complete the documentation for the security interest, even though such documentation had been prepared by Frost's attorney, Schafkopf.

120.    Shortly after commencing his employment with CSO2 as financial officer, Kimmelman was notified by various creditors and the City of Philadelphia about various fines and monies owed that were not disclosed by Frost and Schafkopf as part of CSO2's total indebtedness.

121.    Kimmelman was forced to pay various sums to cover the additional debt and fines owed by CSO2 in order to avoid a shutdown of business.

122.    Frost and CSO2 breached the Jan 2008 Agreement by:

    a.    Frost's failure to reimburse Kimmelman's principal investment of $225,000.00.

    b.    Frost's failure to pay profits to Kimmelman under the Profit Distribution Plan.

    c.    Frost's failure to pay off existing debt's of CSO2.

    d.    Frost's intentional termination of Kimmelman's employment as financial

20

officer for CSO2.

    e.    Frost's intentional diverting CSO2 funds into the Commerce Bank Account without the knowledge or approval of Kimmelman.

    f.    Frost's refusal to execute a mortgage giving Kimmelman a lien on 7104 Frankford Avenue.

    g.    Frost's failure to compensate Kimmelman his salary and benefits under terms of his employment as financial officer of CSO2.

    h.    Frost's refusal to pay Kimmelman interest at the rate of 1.5%/month/18% annual on his $225,000.00 investment.

    i.    Frost's failure to honor the rental payment clause.

    j.    Frost's failure to pay Kimmelman his share of the profits on vehicles purchased with his investment and sold by CSO2.

    k.    Frost's repudiation of March 10, 2008, through his attorney, Schafkopf, that the Jan 2008 Agreement was now "null and void."

    l.    Frost's refusal to turn over all titles to unsold vehicles to Kimmelman.

123.    Frost's actions and statements made by himself or through his attorney constitute positive statements of Frost's unwillingness to perform under the Jan 2008 Agreement.

124.    Frost's positive statements of his unwillingness to perform under the Jan 2008 Agreement constitute a repudiation and breach of the Jan 2008 Agreement..

125.    As a result of Frost's repudiation and breach of the Jan 2008 Agreement, Kimmelman has suffered the following damages.

    a.    $225,000.00 unrecovered principal investment

    b.    unpaid interest on the principal at the rate of 1 ½% per month from March

1, 2008

c.    50% of all profits from the sale of vehicles by CSO2 purchased with

Kimmelman's capital contributions to the partnership.

d.    $1,307.00 per month unpaid benefits from March 1, 2008 to present; and

e.    $850.00 per week in unpaid salary from March 1, 2008 to present

126.    Section 23 of the Jan 2008 Agreement provides that "… all legal cost will be the

responsibility of the party that breaches this agreement."

127.    Kimmelman has incurred substantial attorney's fees in enforcing his rights under

the Jan 2008 Agreement and seeks recovery of such costs from Frost.

WHEREFORE, Plaintiff Gary Kimmelman hereby demands judgment in his favor and

against defendants, Michael Frost and Cars & SUVS Outlet 2 LLC, jointly and severally, in the

amount of:

a.    $225,000.00 unrecovered principal investment

b.    unpaid interest on the principal at the rate of 1 ½% per month from March

1, 2008

c.    50% of all profits from the sale of vehicles by CSO2 purchased with

Kimmelman's capital contributions to the partnership.

d.    $1,307.00 per month unpaid benefits from March 1, 2008 to present; and

e.    $850.00 per week in unpaid salary from March 1, 2008 to present

plus interest, reasonable attorneys' fee, and court costs.

**( Pursuant to Code 7001(1) U.S.C. § 542 )**

## RESCISSION/BREACH OF CONTRACT

128.    Paragraphs 1-128 and 129-239 are hereby incorporated.

129.    On or about February 25, 2008, Schafkopf informed Kimmelman that the Jan 2008 Agreement was being unilaterally declared null and void by Frost.

130.    Kimmelman was told by Schafkopf that if he wanted to ever see his money returned, he must sign a new agreement with Frost and accept new employment terms.

131.    Schafkopf also informed Kimmelman that he would no longer be in control of any financial matters of CSO2.

132.    In February, 2008 Schafkopf drew up the Addendum and insisted that Kimmelman sign it.

133.    The Addendum substantially changed the terms of the Jan 2008 Agreement without any additional consideration to Kimmelman.

134.    Kimmelman believed that if he did not sign the Addendum, he would never be able to recover not only his initial investment of $225,000.00, but also the profits to which he was entitled to under the Jan 2008 Agreement and his salary and benefits.

135.    As a result of the economic duress presented by Schafkopf, Kimmelman agreed to sign the Addendum.

136.    In addition to the Addendum, Schafkopf and Kimmelman negotiated new terms for Kimmelman's employment with CSO2.

137.    Schafkopf tendered terms for such employment in a document dated March 10, 2008. (Exhibit "F")

138.    Kimmelman rejected the March 10, 2008 terms

139.    Schafkopf also told Kimmelman that he [Kimmelman] would have to invest an

additional $20,000.00 in CSO2 "if he ever wanted to see his money again."

140.    On or about March 10 Kimmelman, reasonably fearing that he would lose his entire investment with CSO2, demanded from Frost the title documents to the cars that were purchased for CSO2 with Kimmelman's financial contributions to his partnership with Frost..

141.    Frost refused to give up the title documents and forced a physical confrontation in his office by physically blocking Kimmelman's egress from exiting through the office door.

142.    Frost then filed a private criminal complaint in Philadelphia Municipal Court which resulted in the issuance of an arbitrator's order barring Kimmelman from CSO2's offices.

143.    Frost's actions prevented Kimmelman from performing his obligations under the Addendum.

144.    As a result of Frost's actions as alleged in this Complaint none of the terms of the Feb 2008 Amendment ever became operative and became an impossibility to perform.

145.    Kimmelman is entitled to a rescission of the Addendum.

146.    Kimmelman's remedy pursuant to a rescission is to declare the Addendum null and void.

147.    In the alternative, Frost's actions amount to a breach of the Addendum.

148.    As a result of Frost's breach of the Addendum, Kimmelman has suffered the following damages:

      a.    $256,000.00 unrecovered principal investment

      b.    fifty percent (50%) of any monies collected from Louis Rodriguez by Cars & SUV Outlet, II, LLC regarding the vehicle purchased prior to the date of execution of the Addendum.

      c.    unpaid interest on the principal at the rate of 2.5098% per month from

March 31, 2008

WHEREFORE, Plaintiff Gary Kimmelman hereby demands judgment in his favor and against defendants Michael Frost and CSO2 declaring the Addendum rescinded and null and void, plus reasonable attorneys' fees, and court costs.

IN THE ALTERNATIVE, Plaintiff Gary Kimmelman hereby demands judgment in his favor and against defendants Michael Frost and CSO2, jointly and severally, in an amount equal to:

a.    $255,000.00 unrecovered principal investment

b.    fifty percent (50%) of any monies collected from Louis Rodriguez by Cars & SUV Outlet, II, LLC regarding the vehicle purchased prior to the date of execution of the Addendum.

c.    unpaid interest on the principal at the rate of 2.5098% per month from March 31, 2008

plus interest, reasonable attorneys' fee, and court costs.

------------------------------------------------------------------------------------------------------------------

## BREACH OF FIDUCIARY DUTY

149.    Paragraphs 1-149 and  150-239 are hereby incorporated.

150.    Frost, under the Jan 2008 Agreement, was responsible for all vehicle sales.

151.    In practice, Frost had a fiduciary duty to Kimmelman to report the gross income from all sales and deposit the funds with Kimmelman.

152.    Kimmelman, as financial partner, had a fiduciary duty to Frost to ensure that funds were deposited in CSO2's bank accounts, and to pay all bills, wages and salaries, and distribute profits.

153.   Frost breached his fiduciary duty to Kimmelman when he willfully and intentionally opened the Commerce Bank Account and secretly diverted CSO2's funds to it.

154.   Such breach, was material to the contractual relationship between Kimmelman and Frost.

155.   As a result of Frost's breach if his fiduciary duty Kimmelman suffered money damages as alleged in Paragraph 127 and was ultimately forced to discontinue the partnership by Frost's repudiation of the Jan 2008 Agreement.

156.   Frost's willful intent to breach his fiduciary relationship to Kimmelman was so egregious and so shocking to the senses that he should be punished by society for his actions.

157.   Kimmelman is therefore entitled to punitive damages in addition to specific damages.

WHEREFORE, Plaintiff Gary Kimmelman hereby demands judgment in his favor and against defendants, Michael Frost and Cars & SUVS Outlet 2 LLC, jointly and severally, in the amount of:

a.   $225,000.00 unrecovered principal investment

b.   unpaid interest on the principal at the rate of 1 ½% per month from March 1, 2008

c.   50% of all profits from the sale of vehicles by CSO2 purchased with Kimmelman's capital contributions to the partnership.

d.   $1,307.00 per month unpaid benefits from March 1, 2008 to present; and

e.   $850.00 per week in unpaid salary from March 1, 2008 to present

f.   punitive damages in an amount to be determined by the court

plus interest, reasonable attorneys' fee, and court costs.

<u>Pursuant to Rule 7001(6) U.S.C. § 523(a)(4)</u>

### ALTER EGO

158.   Paragraphs 1-158 and 159-239 are incorporated by reference.

159.   CSO2 is a Pennsylvania limited liability company solely formed, owned, managed, and controlled by Frost.

160.   Frost formed CSO2 specifically for the purpose of avoiding personal liability for the actions, omissions and contractual obligations of CSO2.

161.   It is believed and therefore averred that:

    a.      CSO2 was formed defectively as a Pennsylvania limited liability company as having failed to complete all the required formalities to organize and maintain itself as a Pennsylvania limited liability company.

    b.      CSO2 was never operated as an entity separate from Frost.

    c.      CSO2 was not established on an adequate financial basis, and always insolvent.

    d.      CSO2 funds were co-mingled with Frost's personal funds.

    e.      Frost intentionally diverted CSO2 profits into a secret bank account.

    f.      CSO2 was formed so as to deceive the public as to believe that Frost's actions were being conducted solely on behalf of CSO2 and for no personal purpose beyond the scope of his authority.

162.   Due to the intent of Frost to conduct the actions alleged in Paragraph 75, Frost has operated CSO2 as the alter ego of himself.

163.   Frost is therefore personally liable for the contracts and action of CSO2.

WHEREFORE, for the reasons set forth above, Plaintiff Kimmelman respectfully requests that the Court to PIERCE THE VEIL OF THE CORPORATION, and enter judgment (NON DISCHARGE OF DEBT) in favor of Plaintiff and against defendants, Frost and CSO2's declaring that: CSO2's is merely the alter ego of defendant Frost, Frost is personally and liable for all actions of CSO2's, that Frost and CSO2's are jointly and severally liable to Plaintiff on Plaintiff's causes of action and awarding Plaintiff such other and further relief as may be necessary, just and proper under the circumstances.

### ( Pursuant to Rule 7001(6) U.S.C. § 523(a)(6)  Willful and Malicious Conduct )

------------------------------------------------------------------------------------------------

### FRAUD

164.    Paragraphs 1-164 and  165-239 are incorporated by reference.

165.    Both Frost and Schafkopf had knowledge that the representations and omissions made to Kimmelman regarding CSO2's debt were false and misleading.

166.    Frost and Schafkopf also intended that the representation and omissions were made induce Kimmelman to enter into the Jan 2008 Agreement.

167.    Frost and Schafkopf also knew that the representation and omissions would be material to Kimmelman's decision to enter into the Agreement.

168.    Frost and Schafkopf intended that Kimmelman would be deceived and reasonably rely upon them in making his decision to sign the Agreement.

169.    Kimmelman did reasonably rely on the representations and omissions when he made his decision to enter into the Agreement with Frost.

170.    The representation and omissions made by Frost and Schafkopf were material to Kimmelman's decision to enter into the Agreement.

171.    Due to Frost's and Schafkopf's representations and omissions Kimmelman paid Frost $225,000.00 for what he believed to be an investment in a partnership to manage CSO2, a business having no more than $23,000.00 in outstanding debt.

172.    Instead, CSO2's debt was approximately $55,000.00.

173.    This additional and undisclosed debt caused major concern for Kimmelman and required immediate payment from CSO2 operating account which had to be replaced from profits from the sale of vehicles in excess of the 20% provided in the Jan 2008 Agreement.

174.    Due to the representations and inducements made to Kimmelman by Frost and Schafkopf, Kimmelman suffered damages as alleged in Paragraph 126.

175.    Frost's and Schafkopf's actions constitute tortuous misrepresentation.

176.    Frost's and Schafkopf's actions were so egregious and so shocking to the senses that they should be punished by society for their actions.

177.    Kimmelman is therefore entitled to punitive damages in addition to specific damages.

WHEREFORE, for the reasons set forth above, Plaintiff, Gary Kimmelman respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant Frost in an amount of:

    a.    $225,000.00 unrecovered principal investment

    b.    unpaid interest on the principal at the rate of 1 ½% per month from March 1, 2008

    c.    50% of all profits from the sale of vehicles by CSO2's purchased with Kimmelman's capital contributions to the partnership.

    d.    $1,307.00 per month unpaid benefits from March 1, 2008 to present; and

29

e.      $850.00 per week in unpaid salary from March 1, 2008 to present

f.      punitive damages in an amount to be determined by the court

plus interest, reasonable attorneys' fee, and court costs

## ( Pursuant to Code 7001(6) U.S.C. § 523(a)(2) False Pretense, False Representation, Actual Fraud)

-------------------------------------------------------------------------------------------

Aqua Clear Technologies– United States Bankruptcy Court, Southern District Florida 361 Bankr. 567 (2007)

Litchfield Asset Management Corp. v. Howell, 70 Conn.App. 133, 799 A.2d 298(2002)

Acree v. McMahon, 258 Ga.App.433,574 S.E.2d. 567, 2002 WL 31554122 (2002)

-------------------------------------------------------------------------------------------

### CONVERSION AGAINST DEFENDANT MICHAEL FROST and CSO2's

178.    Paragraphs 1-178 and 179-239 are hereby incorporated.

179.    Frost intentionally and without authorization converted profits derived from CSO2's sale of vehicles under the Nov 2007 Agreement for his own personal use and profit.

180.    Frost intentionally and without authorization converted partnership funds and profits derived from CSO2's sale of vehicles for his own personal use and profit.

181.    In the alternative, Frost, acting as manager of CSO2's, intentionally and without authorization converted partnership profits derived from CSO2's sale of vehicles his own personal use and profit.

182.    Frost intentionally and without authorization withheld and converted partnership profits the exact amount of which cannot be determined without an Accounting.

183.   Frost intentionally and without authorization converted and used Kimmelman's credit card to pay for advertising for CSO2. (exhibit Z, Z1 & Z2)

184.   Due to the actions of Frost, Kimmelman has suffered damages, the exact amount of which cannot be determined without an accounting.

185.   Frost's actions were so egregious and so shocking to the senses that he should be punished by society for his actions.

186.   Kimmelman is therefore entitled to punitive damages in addition to specific damages.

187.   Frost's and CSO2's actions were so egregious and so shocking to the senses that they should be punished by society for their actions.

188.   Kimmelman is therefore entitled to punitive damages in addition to specific damages.

WHEREFORE, for the reasons set forth above, Plaintiff, Gary Kimmelman respectfully requests that the Court enter judgment in favor of Plaintiff and against defendants Frost, or in the alternative, CSO2's, in an amount to be determined by an Accounting including interest, punitive damages in an amount to be determined by the court, court costs, and awarding Kimmelman such other and further relief as may be necessary, just and proper under the circumstances.

### Pursuant to Code 7001(2)  Validity, Priority or Extent of Lien

### Pursuant to Code 7001(1) U.S.C. § 523(a)(4) Fraud as Fiduciary, Embezzlement

## CONSPIRACY TO CONVERT PARTNERSHIP ASSETS

189. Paragraph 1-189 and 190- 239 are hereby incorporated by reference

190.    Frost and  acted as alleged with a common purpose to convert partnership assets.

191.    Frost  acted as alleged with a common purpose to deceive Kimmelman as to the whereabouts of the partnership assets and to prevent Kimmelman from realizing his share of the profits from the intended use of the partnership assts.

192.    As previously averred and incorporated herein, Frost  acted by unlawful means and with unlawful purpose;

193.    The actions of Frost  were overt and done in pursuance of the common purposes;

194.    The actions of Frost and (CSO2's)  were intended to harm Kimmelman.

195.    As a result of the actions of Frost,  Kimmelman suffered damages in the amount of  $ 130,000.00 plus an undetermined amount in lost profits.

196.    Because Frost purposely acted to knowingly and intentionally harm

Kimmelman, he/(CSO2's) are jointly and severally liable to Kimmelman for his damages.

197.    The actions of Frost and (CSO2's)  were so egregious and so shocking to the senses that they should be punished by society for their actions.

198.    Kimmelman is therefore entitled to punitive damages in addition to specific damages.

WHEREFORE, for the reasons set forth above, Plaintiff Kimmelman respectfully requests that the Court enter judgment in favor of Plaintiff and against defendants Michael Frost and (CSO2"s), jointly and severally, in the amount of $130,000.00 including interest, punitive

32

damages in an amount to be determined by the court, court costs, and awarding Kimmelman

such other and further relief as may be necessary, just and proper under the circumstances

**( Pursuant to Rule 7001(6) U.S.C. § 523(a)(4) Fraud as Fiduciary, Larceny)**

---

### COUNT XI – APPOINTMENT OF RECEIVER

199.    Paragraphs 1-199 and 201-239 are hereby incorporated.

200.    Kimmelman duly performed the conditions on his part to be performed and the partnership thereafter commenced business on or about January 10, 2008. From that time to the present, the partnership has operated and is operating profitably.

201.    Although the partnership has earned substantial net profits prior to the filing of this action, believed to be in excess of $850,000.00, Frost has failed and refused to account to or divulge the amount of profits or the details of the partnership's business to Kimmelman, despite repeated requests.( Revenues    2008 – 1.6Million, 2009 – 1.1million)

202.    Frost has personally retained the profits of the partnership and has neglected and refused to pay to Kimmelman his share, although duly demanded.

203.    Frost has denied Kimmelman access to the books of the partnership although duly demanded.

204.    Frost has denied Kimmelman the right to participate in the business as a partner and has refused to permit Kimmelman to enter into the operation of the business.

205.    Frost has converted substantial sums of money belonging to the partnership and constituting partnership assets to his or her own personal use and benefit and has used all or a portion of such partnership assets to commence and operate other and further businesses for his

own personal and exclusive use and benefit.

206.    Frost's attorney, Schafkopf, verbally repudiated the Jan 2008 Agreement when he

indicated to Kimmelman that it was "null and void.

207. Section 19 of the Jan 2008 Agreement provides:

> Mr. Kimmelman after meaningful discussions with Mr. Frost has
> the option of terminating this agreement, if within a 60 day period
> the problem must be resolved, Mr. Frost doesn't remedy the
> existing problems, that could include any legal financial or any
> other circumstances not listed from his actions or inactions that
> could have a detrimental effect on Mr. Kimmelman 's investment
> in Cars & SUV's Outlet 2 LLC. Mr. Kimmelman will have an
> option of closing off all floor plans/credit lines and proceed with
> the liquidation of the automobile inventories, in a manner
> beneficial to both parties without any adversity to either party. Mr.
> Kimmelman will be reimbursed the purchase price of the vehicle,
> plus 50% of the gross profit, less only repair cost allocated to each
> vehicle, if any problems are still unresolved. Mr. Kimmelman will
> make every effort to assist Mr. Frost in resolving say problems,
> provided all factual information is tendered upon request.

208.    Kimmelman also has not been fully compensated under terms of the Nov 2007

Agreement.

209.    In June 2008 Kimmelman personally researched the dockets of the Philadelphia

County Court of Common Pleas and discovered numerous civil actions involving Frost and his

former business partners and creditors. (Exhibit "K").

210.    Kimmelman reasonably fears that by filing this civil action Frost may take such

action that would prevent Kimmelman from ever being repaid his investment.

211.    Kimmelman reasonably believes that Frost will either cause CSO2 to cease

business operations and/or file for bankruptcy protection or dissipate all assets of CSO2 to avoid

paying any monies owed to Kimmelman.

WHEREFORE, plaintiff demands a decree:

1.    That plaintiff, Kimmelman, under terms of the Jan 2008 Agreement be entitled to:

    a.    $225,000.00 unrecovered principal investment

    b.    unpaid interest on the principal at the rate of 1 ½% per month from March 1, 2008

    c.    50% of all profits from the sale of vehicles by CSO2's purchased with Kimmelman's capital contributions to the partnership.

    d.    $1,307.00 per month unpaid benefits from March 1, 2008 to present; and

    e.    $850.00 per week in unpaid salary from March 1, 2008 to present

plus interest, reasonable attorneys' fee, and court costs.

2.    That plaintiff, Kimmelman, under terms of the Nov 2007 Agreement be entitled to an amount of $20,010.00, plus/minus adjustment for sold vehicles, plus interest, and court costs.

3.    That a Receiver of the property, rights, and good will of the partnership be appointed with power to operate and manage CSO2's and to conserve the asserts of the partnership including all assets of defendant, CSO2, until Kimmelman is completely compensated for his damages.

4.    That the remaining profits of the partnership be divided and that plaintiff recover 50% of the profits of the partnership and the costs of this action; and

5.    That plaintiff have such other and further relief as may be just and proper.


## COUNT XII – ACCOUNTING

212.    Paragraphs 1-213 and 214-239 are hereby incorporated.

213.    At all times pertinent to this action, Frost was a fiduciary of and stood in a confidential relationship with Kimmelman in that it was Frost who was responsible for collecting

the proceeds from vehicle sales at CSO2 and turning them in for deposit into CSO2's bank

accounts on behalf of the partnership.

214.    Under the Nov 2007 Agreement, Kimmelman is owed, as compensation for his

investment: an amount of $20,010.00, plus/minus adjustment for sold vehicles, plus interest.

215.    Under the Jan 2008 Agreement, Kimmelman is owed, as consideration for his

investment and for services rendered to CSO2 on behalf of the partnership, restitution of his

investment, a sum equal to fifty (50%) percent of the gross profits of the sales of vehicles

purchased for resale by CSO2 by Kimmelman's partnership contribution, plus interest. Which

amount is to be computed quarterly by Frost and a true account rendered to Kimmelman,

216.    From January 10, 2008, Kimmelman faithfully discharged his duties as financial

partner for CSO2 and in all ways performed the obligations imposed on him.

217.    Frost, in violation of :

    a.    his fiduciary and confidential relationship to Kimmelman,

    b    his contractual obligation to Kimmelman,

    c     has damaged Kimmelman as follows:

    (i) Frost has failed and continues to fail to place CSO2's funds and

    proceeds from the sales of vehicles in proper CSO2's bank accounts as

    required by the Jan 2008 Agreement,

    (ii) Frost has improperly commingled CSO2's funds with his own funds;

    (iii) Frost has failed and continues to fail to satisfy all bona fide

    obligations of the Nov 2007 Agreement;

    (iv) Frost has failed and continues to fail to satisfy all bona fide

    obligations of the partnership from the proceeds as required by the Jan

2008 Agreement;

(v) Frost has failed and continues to fail to pay to Kimmelman his pro rata

share of the proceeds as required by the Jan 2008 Agreement, or any sum

whatsoever;

(vi) Frost failed to provide compensation and benefits to Kimmelman as

an employee of CSO2.

(vii) Frost terminated Kimmelman's employment without justification or

excuse.

## Pursuant to Rule 7001(6) U.S.C.§ 523(a)(4)

218.    Kimmelman believes, and therefore avers, that Frost has been and continues to

improperly spend, waste, disburse, and otherwise utilize the proceeds for his own personal use

and benefit, rather than for the use and benefit of the partnership; and

219.    Although demand has been made, Frost has failed and refused, and continues to

fail and refuse, to comply with the Jan 2008 Agreement.

220.    Kimmelman believes, and therefore avers, that bona fide obligations of the

partnership remain unsatisfied in the amount of approximately $653,000.00

221.    All of the books, papers and accounts of CSO2's are in the sole custody of Frost

and Kimmelman has no way of ascertaining the amount actually due to him under the Jan 2008

Agreement but believes the amount is approximately $653,000.00

222.    Kimmelman has demanded of Frost a true accounting of the gross profits of

CSO2 and payment of the fifteen percent of the gross profits due to Kimmelman, but Frost has

refused, and continues to refuse, to so account or to pay Kimmelman the sum due him or any part

thereof.

223.    Kimmelman does not have an adequate remedy at law.

WHEREFORE, plaintiff, Kimmelman demands that an order be entered:

(a)    Directing defendants Frost and CSO2's to account to plaintiff Kimmelman for all proceeds received by Frost and CSO2, all satisfied obligations of Frost and CSO2, and all remaining obligations of Frost and CSO2's;

(b)    Enjoining defendants Frost and CSO2's from spending or utilizing any of the proceeds from vehicle sales for their own personal use and/or benefit, or that of any other person or entity other than the partnership, and then only upon the express written approval of plaintiff or further order of this court;

(c)    Directing defendants Frost and CSO2's to place into a special escrow bank account, in the names of a court appointed receiver and Kimmelman, an amount of money equal to the proceeds of vehicle sales received by defendants, withdrawal to be only upon the signatures of both Receiver and Kimmelman;

(d)    Directing defendants Frost and CSO2's to specifically comply with all provisions in the Nov 2007 Agreement, particularly those relating to accounting and valuation, so that the parties' respective shares in the net amount of the proceeds may be determined;

(e)    Directing defendants Frost and CSO2's to specifically comply with all provisions in the Jan 2008 Agreement, particularly those relating to accounting and valuation, so that the parties' respective shares in the net amount of the proceeds may be determined;

(f)    Directing defendant Frost and CSO2's to satisfy any remaining valid obligations of the partnership;

(g)    Directing defendants Frost and CSO2's to pay over to plaintiff, Kimmelman one

38

half of the net remaining total amount of the proceeds from the sale of vehicles purchased

with Kimmelman's partnership contributions, plus interest, attorneys' fees, and punitive

damages, and entering judgment in favor of plaintiff and against defendants in such

amounts;

(h)    That the proceeds from CSO2's vehicle sales utilized and employed by Frost for

his personal business and use be declared and found to constitute a trust fund for the

benefit of the partnership, and Frost be required to account therefore and the profits there

from;

(i)    Enjoining defendants Frost and CSO2's, its officers, agents, servants, and

employees from further borrowing, paying, or otherwise transacting any business or

transactions in the name of the partnership, on its behalf, or in the name of or on behalf of

any other venture which pertains, or relates in any way, to plaintiff Kimmelman, unless

upon further written order of this Court or upon express written approval from

Kimmelman; and

(j)    Granting such other and further relief as this Court may deem appropriate.

**(Pursuant to Rule 7001(1) U.S.C. § 548)**

---

### DEFAMATION

224.    Paragraphs 1-224 and 225-239 are hereby incorporated.

225.    Frost/(CSO2's) initiation of a private criminal complaint against Kimmelman was

based upon knowingly and intentionally false and malicious statements.

226.    Frost/(CSO2's) was under oath when he made the false and malicious statement.

227.    Frost/(CSO2's) detracted from Kimmelman's reputation, injured his character,

fame, and reputation by his knowingly false and malicious statements.

228.    Frost/(CSO2'S) acted intentionally and maliciously to blacken the reputation of Kimmelman, holding him up to public ridicule, hatred and contempt, and tending to lower him in the estimation of a respectable portion of the community, deterring others from dealing with him.

229.    Frost/(CSO2's) acted knowingly, with the intent to harm Kimmelman by making it impossible for Kimmelman to conduct his rights and obligations under terms of the Jan 2008 Agreement, and the subsequent Addendum.

230.    Frost/(CSO2's) defamatory statements were published to the Philadelphia Municipal Court and written into the private criminal complaint.

231.    Frost/(CSO2's) knowingly, intentionally, and maliciously made further defamatory and libelous statements under oath when he filed his notice of non-compliance.

232.    As a result of Frost's libelous publications Kimmelman has suffered impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering, as well as damages as alleged resulting from Frost/(CSO2'S) repudiation of the Jan 2008 Agreement.

233.    The actions of Frost/(CSO2's) were so egregious and so shocking to the senses that they should be punished by society for their actions.

234.    Kimmelman is therefore entitled to punitive damages.

WHEREFORE, for the reasons set forth above, Plaintiff, Gary Kimmelman respectfully requests that the Court enter judgment in favor of Plaintiff and against defendant Frost in an amount to be determined by an Accounting including interest, punitive damages in an amount to be determined by the court, court costs, and awarding Kimmelman such other and further relief as may be necessary, just and proper under the circumstances.

**(Pursuant to Rule 7001(6) U.S.C. § 523(a)(6) Willful and Malicious Conduct**

-----------------------------------------------------------------------------------------------

### DECLARATION OF MORTGAGE AGREEMENT

235.    Paragraphs 1-234 and 236-239 are hereby incorporated.

236.    A Mortgage agreement, that was substantially negotiated and agreed to by

Kimmelman and Frost through his attorney, and was drawn up by Schafkopf for final execution.

(Exhibit "H").

237.    Frost refused to sign the Mortgage Agreement even though obligated to do so

under terms of the Jan 2008 Agreement.

238.    Kimmelman avers that the written Mortgage Agreement, even though unsigned

by Frost, is a true and correct writing of the negotiated terms of the agreement between the

parties.

239.    Such Mortgage Agreement, as a writing, is sufficient to be filed with the Recorder

of Deeds as a legally enforceable instrument and lien against the subject property.

WHEREFORE, plaintiff Kimmelman demands a decree that the Mortgage Agreement is

a legally enforceable instrument and may be filed with the Recorder of Deeds as a lien against

the subject property, that judgment be entered for plaintiff Kimmelman and against Defendant

Frost, and that Plaintiff, Kimmelman be awarded all court costs and such other and further relief

as may be just and proper.

### **(Pursuant to Rule 7001(1) § 542 Turnover of Property**

## Conclusion

The Debtor/Defendant certainly has not shown the capacity to turn a profit to benefit the

Plaintiff (Kimmelman) and be able to survive in the short term, let alone a reorganization plan by

September 9, 2010.  The Defendant/Debtor does not have the fortitude to go forward without the

fraudulent activities of his previous actions in this new Chapter 11 proceeding.


I am asking the court to disallow  the Defendant/Debtor to attempt to Discharge of Debt owed to

Plaintiff (Kimmelman), and to provide him with the intended UCC-1 Mortgage Documented

provided by Defendant's attorney Gary Schafkopf, to properly secure Plaintiff (Kimmelman)

proof of claim against Frost/Cars & Suv Outlet 2 LLC and all other entities presently owned or

partnered  by Defendant Frost.

Document C, expressly states " ***This Note is a First Priority Note & All Payments Must Be***

***Made Before  Any Other Expenses Are Paid***"*dated 2/28/2008* which supersedes,  those Claims

of Manheim Auto Credit.



Respectfully submitted,

GARY KIMMELMAN- Pro Se